UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANICE BAILEY,

                                CASE NO. 15-10623

        *Plaintiff*,             DISTRICT JUDGE SEAN F. COX

*v.*                              MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS
MOTIONS FOR SUMMARY JUDGMENT (Docs. 21, 26)**

I.     **RECOMMENDATION**

       In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Bailey is not disabled. Accordingly, **IT IS RECOMMENDED** that Bailey's Motion for Summary Judgment, (Doc. 21), be **DENIED**, the Commissioner's Motion, (Doc. 26), be **GRANTED**, and that this case be **AFFIRMED**.

II.    **REPORT**

     **A.**     **Introduction and Procedural History**

       Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Janice Bailey ("Bailey") claim for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et*

1

*seq.* (Doc. 2). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 21, 26).

On June 26, 2012, Bailey filed an application for DIB, alleging a disability onset date of November 10, 2004. (Tr. 104-10). The Commissioner denied her claim. (Tr. 44-51). Bailey then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on September 16, 2013 before ALJ Andrew Sloss. (Tr. 29-43). At the hearing, Bailey—represented by her attorney, Aaron Lemmens—testified, alongside Vocational Expert ("VE") Pauline McEachin. (*Id.*). The ALJ's written decision, issued October 11, 2013, found Bailey not disabled. (Tr. 14-24). On December 19, 2014, the Appeals Council denied review, (Tr. 1-5), and Bailey filed for judicial review of that final decision on February 19, 2015. (Doc. 1).

### B.      Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

2

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

3

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R.

4

404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.   ALJ Findings

Following the five-step sequential analysis, the ALJ found Bailey not disabled under the Act. (Tr. 14-24). At Step One, the ALJ found that Bailey last met the insured status requirements of the Social Security Act on December 31, 2005, and had not engaged in substantial gainful activity during the period from her alleged onset date of November 10, 2004, through her date last insured of December 31, 2005. (Tr. 16). At Step Two, the ALJ concluded that the following impairments qualified as severe: "tendonitis of both elbows and degenerative joint disease of the shoulders . . . ." (*Id.*). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 16-18). Thereafter, the ALJ found that through her date last insured, Bailey had the residual functional capacity ("RFC") to perform light work, except "the claimant is limited to frequent handling and reaching with her upper extremities. (Tr. 18). At Step Four, the ALJ found that Bailey could not perform her past relevant work as an administrative assistant. (Tr. 22). Proceeding to Step Five, the ALJ determined that "there were jobs that existed in significant numbers in the national economy that the claimant could have performed." (Tr. 23).

### E.   Administrative Record

5

### 1.      Medical Evidence

The Court has reviewed Bailey's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

### 2.      Application Reports and Administrative Hearing

#### i.      Function Report

On September 11, 2012, Bailey filled out a Function Report. (Tr. 154-64). She noted that she lived in a house with family. (Tr. 157). Her condition, she indicated, caused "[c]onstaint pain in [her] jaw, neck, back, groin, hip, shoulders, [and] elbows," while her "PTSD prevents me from working face to face." (*Id.*). Talking on the phone would cause neck pain, and "writing, lifting, reaching" would affect "[her right] shoulder [and] neck." (*Id.*). Even using a cane would put "pressure on left shoulder." (*Id.*). Her "migraines" would cause her to seek a "quiet dark place for relief." (*Id.*). Altogether, her pain "nauseated" her when it "escalate[d]." (*Id.*).

In a typical day, Bailey woke up, went to the bathroom, grabbed something to drink, and then would lie back down. (Tr. 158). She would "try" to go through the mail and pay bills, tend to her plants, watch television, spend time with her animals, pray, try to read the paper and discuss the day, but eventually she would ice her neck, back, and shoulder before checking in with family, eating, and napping. (*Id.*). Her husband "assumed everything I can no longer do. And that's a ton!" (*Id.*). Indeed, before the onset of her illnesses, she "worked outside of home," shopped for groceries, "ran all errands, drove myself everywhere alone, cooked 3 meals a day, did all housework," and other numerous tasks.

6

(*Id.*). When she was filling out the form, though, she had trouble sleeping, needed help from her husband to dress and use the toilet, sat in the shower, cut herself shaving, lost her appetite, and found mastication difficult, among other problems. (*Id.*). Everything would take three times longer. (*Id.*). Although she "might prepare something easy [once or twice per] week," she barely cooked anymore because it took "[f]orever." (Tr. 159). Around the house, she could still "wash clothes, fold if load is small, clean toilet [and] wipe counter off, clean mirrors, take care of dry dishes, [and] dust" about once a week, but each task took fifteen to twenty minutes. (*Id.*). Other tasks, such as mowing the lawn or vacuuming, proved difficult because of the pushing and pulling involved. (Tr. 160). She could go out "maybe a couple times a month," but the "[p]ain keeps me down and depression from pain keeps me down." (*Id.*).

Although she could still drive, "I haven't driven alone 10 times in 6 [years]. PTSD and confidence on the road paral[y]zes me. I have but the experience has sickened me everytime." (*Id.*). She attributed this feeling to "being rear-ended [two times] in 8 years, . . ." When leaving to shop, she sought household items, clothes, and gifts, but she typically shopped by phone or mail once or twice a month. (*Id.*). She retained the capacity to pay bills, count change, and use a checkbook, but admitted "difficulty handling our savings" due to low self-esteem. (*Id.*).

Her hobbies included reading, watching television, bowling, billiards, movies, and a variety of other things. (Tr. 161). Even so, her inability to concentrate interfered with reading and watching television, and due to general pain "can't do any" of the others "any more." (*Id.*). It interfered with her social activities as well, for she did not speak with her

7

family or friends "long or frequently" on the phone; a monthly doctor's visit was "about it." (*Id.*). This was a stark contrast to her formal self as a "social butterfly." (Tr. 162).

She emphasized further that "[a]ll physical movements are affected by pain," and her mental difficulties compounded one another. (*Id.*). Among these were lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, memory, completing tasks, concentration, understanding, following instructions, and using hands. (*Id.*). She also noted difficulty following written and spoken instructions. (*Id.*). "I now can only handle stress in small doses far and few []between." (Tr. 163). To accommodate her problems, she used a wheelchair, cane, brace, and glasses, as well as a variety of special pillows and ice packs for back pain. (*Id.*). In her closing remarks, Bailey said she feared "not being capable to support myself and/or contribute to my family and society is also overwhelming." (Tr. 164).

On September 11, 2012, Bailey's husband, Daniel, also filled out a third party Function Report. (Tr. 146-53). Unlike Bailey's report, Daniel does not indicate her difficulty talking, hearing, seeing, understanding, or following instructions. (Tr. 151). In every other way, however, the function reports are essentially consistent.

### ii.        Bailey's Testimony at the Administrative Hearing

At the hearing before ALJ Andrew Sloss, Bailey noted that she had graduated from high school and became a certified bartender recently, though she was not working anywhere at the time, and indeed had not worked since her alleged onset date of November 10, 2004. (Tr. 32-33). She also reiterated that the conditions keeping her from work were:

8

"[d]epression, post-traumatic stress disorder, my fibromyalgia, two herniated discs in my neck and three herniated discs in my back. I also had macular degeneration in my right eye. I had melanoma cancer that I've been dealing with since 2000. The anxiety goes with the depression. Chronic fatigue syndrome. . . . [a] hernia. Hypothyroidism. Tendonitis in both elbows. The degenerate disc disease. . . . Migraines. At that time I had endometriosis. Sciatica . . . . TMJ. Also arthritis in my neck, shoulders, my knee and my back." (Tr. 33).

For depression, Bailey took Cymbalta and Wellbutrin. (Tr. 34). She treated with a psychiatrist and a therapist to "figure out how to get past the post-traumatic stress disorder and depression." (*Id.*). These conditions arose from an assault on the job on November 10, 2004, and were exacerbated by a car accident on December 23, 2004. (*Id.*). In March 2005, she had surgery on her right elbow, followed by a left elbow surgery in July 2005. (*Id.*). Treatment included "pain medication," such as Soma, Vicodin, and a "Duragesic patch." (Tr. 34-35). Her physician, Dr. Betten, treated her throughout this period for her physical problems, while Dr. Nutakki served as her psychiatrist. (Tr. 35). "[A]fter I was assaulted, my ability really deteriorated where I was no longer able to get up and cook dinner, care for my family the way I should, or myself." (*Id.*). As a result, she filed for worker's compensation. (*Id.*).

Her physical conditions would cause "flare ups" many times, and the pain would range from a six to a ten on a ten point scale, where she "wouldn't be able to get out of bed." (Tr. 36). This happened "[p]robably three or four times a week." (*Id.*). "The back pain also causes the sciatic nerve, down my left leg, and I was going to the pain management clinic for injections" to alleviate her symptoms. (*Id.*). As for fibromyalgia,

she had "trigger points [on] both sides of my neck, more on the right than on the left. On my shoulders, I have trigger points that are on my back, in the center, on the right side, and I have pain that's in – pressure points down on my right side of my lower rib area." (Tr. 37). After the car crash, where her left shoulder hit the window, she also had whiplash. (*Id.*). In total, her conditions caused "constant" pain. (*Id.*). It prevented her from reaching or lifting "anything . . . at all, . . ." (*Id.*). At the time, her medication also caused issues such as "constipation," fatigue, "[l]oss of appetite," and "dry mouth . . . ." (Tr. 38). "I could never sit comfortably unless I would have a padded pillow under me, one behind my back, and so I laid often on the bed because the mattress is flat and they recommended that I tried to stay a flat surface with just my feet elevated and a small pillow underneath my neck." (Tr. 39).

Bailey also spoke to her depression. "I cried a lot, I slept a lot, or didn't sleep. . . . Hopelessness and a lack of interest in anything. I no longer had any hobbies or interests. Self-esteem." (Tr. 38). In sharp contrast to her previous independence, "it was like I was afraid to go out in public all of a sudden. I couldn't drive. I felt like I had to have my husband with me to hold my hand or my daughter to even go out into public . . . ." (Tr. 39). This also caused issue with memory. (*Id.*).

### iii.        The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of VE Pauline McEachin to determine Bailey's ability to perform work. (Tr. 40). In the first hypothetical, the ALJ asked the VE to whether a person "able to perform light work, except that she is limited to frequent handling and reaching with . . . both upper extremities" would be able to perform Bailey's

10

past work. (Tr. 41). The VE said no. (*Id.*). But the VE went on to identify other jobs in the national economy available for such a person, such as an "information clerk"—with 220,000 national job availabilities—and an "inspector"—with 50,000 national job availabilities. (*Id.*).

The ALJ then issued the second hypothetical, asking if "that same person, due to her psychological symptoms were limited to unskilled work as defined by the regulations and work that had only occasional changes in the work setting, and that involved only occasional interaction with the general public and coworkers" would be able to secure a job. (*Id.*). The VE noted that the job and numbers for the "inspector" job "would stand," and he added work "as a machine operator" with 30,000 national job availabilities. (Tr. 42). The VE also said that employers would customarily permit no more than one unexcused or unscheduled absence per month, and no more than eight annually. (*Id.*). Upon further questioning by Bailey's attorney, the VE noted that two extra breaks a day, lasting fifteen minutes apiece, would be work preclusive, and an employee would be permitted no more than twenty percent of time off task. (Tr. 42-43).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who

are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at \*2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at \*2 (Aug. 9, 2006).

12

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting

13

objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*,

749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed

15

prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.      Analysis

Bailey rests her argument on the claim that "the ALJ had no medical basis to support his findings of the severity of [her] mental impairments, either under the Listings at Step 3, nor for residual functional capacity at Steps 4 and 5." (Doc. 21 at ID 737). This error arose, she suggests in a general sense, from the ALJ improperly weighing the available record evidence in various respects. Despite her somewhat sloppy execution, I construe Bailey as positing four specific errors in the ALJ's analysis: (1) failing to accredit Bailey's mental conditions as "severe" impairments at Step Two of his analysis; (2) assigning Dr. Tsai's opinion which—because it did not factor Bailey's medical records from Genesys Hillside Center for Behavioral Services ("Hillside") into its considerations—allegedly was "not entitled to any weight, as it was explicitly based on 'insufficient evidence,'" (Doc. 21 at ID 736) (internal citation omitted), while failing to properly consider Dr. Nutakki's and Dr. Martin's opinions from Hillside ("the Hillside opinions"), (Doc. 21 at ID 735); (4) relying on GAF scores "generally in the 52 to 57 range," which typically indicate moderate symptoms, for a finding of mild symptoms not affecting work, (Doc. 21 at ID 737); and (5) in summation, failing to find that her mental conditions met or equaled a Listing, and capping his analysis with an RFC that did not accommodate Bailey's alleged mental conditions. I address each argument in turn.

### 1.      "Severe" Impairments

Bailey's prime (and arguably only) argument is that the ALJ failed to find any of her mental impairments "severe" at Step Two of the analysis. (Doc. 21 at ID 735). Her remaining arguments ostensibly target the ALJ's considerations, or lack thereof, behind this finding.

The severity requirement—codified at 20 C.F.R. §§ 404.1520 and 404.1521—remains a "*de minimis* hurdle in the disability determination process," useful in discarding claims "obviously lacking in medical merit." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). In accordance with these regulations, however, an ALJ must "continue with the remaining steps" in the disability determination when she determines that some impairments qualify as severe, and others nonsevere. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). For this reason, the "fact that some of [a claimant's] impairments were not deemed to be severe at step two is . . . legally irrelevant" when the ALJ considers both "severe and nonsevere impairments in the remaining steps of the sequential analysis." *Anthony v. Astsrue*, 266 F. App'x 451, 457 (6th Cir. 2008).

In this case, the ALJ plainly considered Bailey's nonsevere mental impairments at each step of the disability determination, including the RFC assessment. (Tr. 15, 17, 19, 21-22). For this reason, Bailey's argument on this count should fail. I note, as well, that Bailey's argument—as summed up in her "Conclusion" section—appears to be that "[b]ecause there was no substantial evidence, in fact no evidence, to support the ALJ's conclusion that [she] had no severe mental impairment before the DLI, the decision must be vacated and the case remanded for a new hearing." (Doc. 21 at ID 737). In the spirit of abundant caution, and because ample case law had already condemned this exact argument

17

to failure, I construe Bailey's brief generously as putting forth alternative arguments less susceptible to legal predestination.

## 2.        Dr. Tsai's Opinion and the Hillside Opinions

Baily contends that the ALJ should have given Dr. Tsai's opinion no weight as to her mental impairments because it was based on "NO evidence." (Doc. 21 at ID 736). As the record shows, "while reports from Hillside in the record before the ALJ had been requested, those reports were not included in the 'Evidence of Record' that Dr. Tsai reviewed in making his determination on September 25, 2012." (*Id.*) (internal citations omitted). As such, the ALJ's decision to assign great weight to Dr. Tsai's opinion was allegedly error. The flip side of this argument seems to be that the ALJ did not accord enough weight to the Hillside opinions.

An ALJ may assign weight to state agency medical and psychological consultants "only insofar as they are supported by evidence in the case record." SSR 96-6p, 1996 WL 374188, at *2 (S.S.A. July 2, 1996). Such sources usually do not receive greater weight than treating sources unless "based on a review of a complete case record . . . ." *Id.* at *3. Where there exists "some indication that the ALJ at least considered" records not before the state agency sources, however, no problem arises. *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007); *accord Purdy v. Comm'r of Soc. Sec.*, No. 15-10949, 2016 WL 4771393, at *10 (E.D. Mich. Aug. 19, 2016) ("[T]he agency's non-examining source did not have an opportunity to review any of [the treating physician's] opinions. And because there was no 'indication that the ALJ at least considered these facts before giving greater

weight to an opinion that is not []based on a review of a complete case record,' it would be improper for the ALJ to base his decision on [the state agency physician's] opinions.").

In the matter at hand, the ALJ accorded Dr. Tsai's opinion great weight for being "consistent with the medical evidence of record." (Tr. 22). Bailey correctly notes that Dr. Tsai did not have her mental health records from Hillside before him when performing his review. (Tr. 47) ("Although she alleges depression, there is no evidence of any MI [mental impairment] in the MER [medical evidence of record] . . . ."). With respect to mental impairments, therefore, the ALJ's findings must show that he considered the Hillside opinions in his analysis. Fortunately, he provided sufficient indication that he considered this evidence in his opinion. (Tr. 19) ("An examination performed at that time [June 2005] reveals that the claimant was well nourished, oriented and not depressed or agitated."); (Tr. 21) ("These [Hillside] records indicate a primary diagnosis of major depression and that the claimant's condition and level of functioning remained stable through the date the claimant was last insured. . . . In addition, the record reveals no history of hospitalizations or recurrent emergency room visits with regard to any mental health concerns."). Bailey's suggestion that the ALJ "cited no evidence to support his claim that the reports in the record showed that 'the claimant's condition and level of functioning remained stable through the date the claimant was last insured'" baldly mischaracterizes the ALJ's decision. (Doc. 21 at ID 737). The ALJ's clear-as-day citation to the Hillside opinions—which directly follows the passage Bailey quotes, at (Tr. 21)—signals his consideration thereof. The underlying records provide substantial evidence for his conclusions. *E.g.*, (Tr. 555) (November 2004: finding "[m]oderate" progress); (Tr. 616) (August 2005: found Bailey

19

"generally calm and cooperative," and "den[ying] any active or passive suicidal ideation" despite also being "depressed" and "anxious"); (Tr. 545) (September 2005: "Client sees more clearly what she needs to do and not [do] within relationships and of course within herself."); (Tr. 540) (October 2005: "She's been keeping strong boundaries up with her extended family system and with the strong boundaries is less stressed and able to separate herself from their emotional family issues."); (Tr. 538) (November 2005: "She is doing much better."); (December 2005: "She is better able to look from a good perspective . . . . Progress moderate.").

Because the ALJ considered the Hillside opinions in rendering his findings, Bailey can demonstrate no error in according Dr. Tsai's opinion great weight. My analysis might stop here, as Bailey makes no argument that the Hillside opinions qualify as treating source opinions, and so the ALJ was not required to give "good reasons" in according them partial or no weight, so long as he considered them. 20 C.F.R. § 1527(c)(2). But even if she had successfully made this argument, it could not change the result. On these facts, a logical corollary to sanctioning the weight accorded Dr. Tsai's opinion is sanctioning the weight given the Hillside opinions. Put simply, the ALJ's "indirect[] attack[]" on the consistency of the Hillside opinions with the medical evidence of record "implicitly provided sufficient reasons for not giving those opinions controlling weight, and indeed for giving them little or no weight overall," thus meeting the goal of 20 C.F.R. § 1527(c)(2). *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 472 (6th Cir. 2006).

For these reasons, Bailey's objection to the ALJ's weight assignments should be rejected as lacking merit.

### 3.      The GAF Scores

Another argument Bailey puts forth takes issue with the ALJ's reliance on GAF scores "generally in the 52 to 57 range," which, she argues, indicate "moderate symptoms." (Doc. 21 at ID 737) (internal quotation marks omitted). These, she argues, would certainly have an impact on her ability to perform sustained work activity. (*Id.*).

"A GAF score may help an ALJ assess mental RFC, but it is not raw medical data." *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007). No "statutory, regulatory, or other authority requir[es] the ALJ to put stock in a GAF score in the first place," and if "other substantial evidence . . . supports the conclusion that [a claimant] is not disabled, the court may not disturb the denial of benefits to a claimant whose GAF score is" low. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006); *accord DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006); *cf. Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 836 (6th Cir. 2016) ("[W]e have refused to find that a low GAF score established that the ALJ's decision was not supported by substantial evidence where the ALJ had reason to doubt the credibility of the assigning source; the claimant had conflicting GAF scores; the GAF scores were not accompanied by a suggestion that the claimant could not perform any work; substantial evidence supported the conclusion that the claimant was not disabled; and the VE testified that an individual with the claimant's limitations could still perform a number of jobs.").

Where, as here, the ALJ provided sufficient indication that he gave due consideration to the Hillside (non-treating source) opinions, these opinions lacked any serious contention that Bailey could not work, the scores given Bailey vacillated within the

21

"moderate" symptoms range, and substantial evidence undergirds the ALJ's conclusions, this Court should not disturb his findings on this ground. Indeed, strong language from the Sixth Circuit precludes such an outcome.

### 4.        The Listing and RFC Assessment

In her final contention, Bailey supposes that "[t]he actual evidence shows ongoing impairment due to major depression, which the ALJ omitted from his Listing and RFC findings." (Doc. 21 at ID 737).

As an initial matter, and as discussed above, the ALJ did not omit discussion of Bailey's mental impairments from his listing and RFC assessments. Notably, Bailey includes no clues as to what this "actual evidence" might be, and excludes from her brief any factual discussion regarding Bailey's mental impairments and the limitations they might impose on her capacity to work. Nor does she indicate what listing she meets. Though one could venture a guess in either case, the Sixth Circuit makes clear that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995)) (internal quotation marks omitted).

Bailey declined to offer even a rudimentary articulation of the ALJ's failings, and this Court is ill equipped to sketch their dimensions on her behalf. For this reason, this Court should reject her argument.

22

H.      Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Bailey's Motion for Summary Judgment, (Doc. 21), be **DENIED**, that the Commissioner's Motion, (Doc. 26), be **GRANTED**, and that this case be **AFFIRMED**.

## III.  <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ.

23

P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  December 28, 2016                       S/ PATRICIA T. MORRIS
                                                                Patricia T. Morris
                                                                United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: December 28, 2016                         By s/Kristen Castaneda
                                                                Case Manager